**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**DeRON MCCOY,**

      **Plaintiff,**

      **v.**                          **Case No. 12-3160-CM**

**TYSON MEYERS, DARRIN PICKERING,
BRICE BURLIE, JERAMY HEDGES, AND
COREY GRABER,**

      **Defendants.**

---

**MEMORANDUM AND ORDER**

Plaintiff DeRon McCoy brings this action under 42 U.S.C. § 1983 against Hutchinson police officers Tyson Meyers, Darrin Pickering, and Brice Burlie, and Reno County sheriff's deputies Jeramy Hedges and Corey Graber, alleging that defendants used excessive force in arresting him in violation of his Fourth Amendment rights. Plaintiff was arrested at a Hutchinson, Kansas hotel on March 22, 2011 and was later convicted of numerous charges related to the incident.  He is currently incarcerated.

The matter is now before the court on defendants Meyers, Pickering, and Burlie's Motion for Summary Judgment (Doc. 163) and defendants Hedges and Graber's Motion for Summary Judgment (Doc. 164).  Defendants assert they are qualifiedly immune because they acted reasonably in a high-risk hostage situation.  The court finds defendants are entitled to qualified immunity in this case and therefore grants defendants' motions.

I.      **Factual Background**

On March 20, 2011, plaintiff, along with his infant daughter and adult sister, checked into a room at the Budget Inn in Hutchinson, Kansas.  At some point on March 22, 2011—while plaintiff and his sister and daughter still occupied the room—LeAnna Daniels, the mother of plaintiff's daughter,

arrived at the hotel with her friend Gwendolyn Roby.  It is unclear what occurred once Daniels and Roby arrived at the hotel, however, Roby eventually placed a call to 911 to report that plaintiff would not give his daughter to Daniels and that plaintiff had a gun.  At approximately 4:38 p.m., officers were dispatched to the hotel.  Upon arrival, they encountered Daniels, who informed them that plaintiff was inside the room with the baby, and that he had flashed a gun at her.  Police began attempting engagement with plaintiff to no avail.  Plaintiff allegedly continued to refuse to come out of the room, telling police to get back and leave him alone.  Police could hear the baby and plaintiff's sister inside the room.  Plaintiff, however, claims he never spoke to police that day.

Defendants, all members of the Emergency Response Team ("ERT"), were notified at approximately 6:40 p.m. that they needed to report to the Budget Inn.  Upon arrival at the scene, defendants were informed that an armed male was in the hotel room with another woman and a baby and that this was being treated as a hostage situation.  Defendants heard a negotiator attempting to make contact with plaintiff via a PA system, but never heard anyone in the room respond.  Officers grew concerned when a substantial amount of time had passed without any contact or noise from the room, and feared plaintiff might have harmed his daughter or sister.  Defendant Burlie entered the hotel room next to plaintiff's room to determine whether there was any sound or activity.  Burlie heard nothing.  At this point the ERT leader ordered his team to enter plaintiff's room out of concern for the safety of the room's occupants.

At approximately 9:05 p.m., defendants Pickering, Graber, Burlie, and Hedges entered plaintiff's room in a "stack formation" using the hotel's master key.  Defendants heard plaintiff yell "get the fuck back" as they entered the room.  Plaintiff claims he was not aware police were even at the hotel or attempting to communicate with him until they entered his room.  Defendant Pickering, holding a ballistic shield, was the first officer to enter the room.  Upon entering the room, he saw

plaintiff on the bed with his daughter and sister.  Plaintiff had the gun under his sister's chin, and was ducking behind her.  Plaintiff does not deny there was a gun in the room that evening, but denies ever having a gun in his hand.  Defendants, however, claim plaintiff began pointing the gun at the officers and then back toward his sister.  Defendant Meyers, who had not yet entered the room, heard the officers shouting at plaintiff to drop his gun.  Many of the defendants testified they were in fear for their lives.

Defendants claim that despite repeated demands, plaintiff refused to drop the gun.  Defendant Burlie asked defendant Graber if he was in a safe position to shoot plaintiff, to which defendant Graber replied he was not.  At some point plaintiff lost control of the gun.  Plaintiff claims he dropped the gun despite also arguing he never had a gun in his hand.  Defendant Hedges grabbed the gun and was able to remove it from the room.  Plaintiff's sister and daughter were also removed from the room during this time.

As plaintiff's gun was being removed from the room, defendant Burlie jumped on the bed and, in an attempt to restrain plaintiff, grabbed him and began pulling him to the floor.  During the struggle to control plaintiff, defendant Burlie felt him reaching for his gun, which was holstered in his right thigh holster.  Plaintiff asserts he did not attempt to grab the gun, rather, he submitted to arrest as soon as defendant Burlie first grabbed him.  Defendant Pickering, however, heard defendant Burlie yell that plaintiff was grabbing his gun and then saw plaintiff's hand on the handle of defendant Burlie's gun. Defendant Burlie got plaintiff onto the ground and defendant Pickering then applied a hold[1] on plaintiff to subdue him and prevent him from grabbing for defendant Burlie's gun.

Defendants claim they applied a Lateral Vascular Neck Restraint ("LVNR") on plaintiff.  Both defendants Pickering and Meyers are trained in using the LVNR technique, which is designed to

---

[1] Defendants refer to the hold as a Lateral Vascular Neck Restraint ("LVNR"). Plaintiff claims it is a chokehold.  For purposes of this order, the court will refer to the act as a "hold."

control a situation or an individual when an individual does not respond to verbal commands, is combative, or is resistant.  (Doc. 166-6, at 8.)  According to defendant Meyers, the LVNR is not intended to cut off oxygen to a person's brain, but may render an individual unconscious.  Defendant Meyers also testified that there are multiple levels of LVNR application—Level 1, Level 2, Level 3, and Level 1 minus.  The level of LVNR application applied depends on how resistive the subject is.  Defendant Pickering claims he initially placed plaintiff in a Level 1 hold, but escalated to a Level 3 because plaintiff would not stop resisting.  The Level 3 application caused plaintiff to go unconscious, but defendants assert plaintiff did not stop breathing.

Plaintiff claims he was not resisting arrest when he was placed in the hold and that the hold caused him to go unconscious and stop breathing.  He asserts that because he stopped breathing, the hold could not have been an LVNR and instead was a chokehold.  Plaintiff believes he stopped breathing based on a statement made by defendant Burlie in his police report that "Sgt. Meyers and Officer Pickering sat Deron up and began patting him on his back to help him start breathing again." (Doc. 166-13, at 19.)   Defendant Burlie later corrected his statement in a deposition saying he misspoke: "I just used the wrong term. I meant to say that he was out of it or unconscious.  I never once checked to see if he was breathing and I didn't know if he was breathing.  Basically, all I did was look at him.  What I meant to say is he was unconscious." (Doc. 166-3, at 24.)

It is uncontested that the first hold lasted somewhere between five and ten seconds.  Defendant Meyers entered the room after defendant Pickering applied the hold and while plaintiff was unconscious.  He could see other officers attempting to get plaintiff in custody and positioned himself behind plaintiff and moved him into a seated position.  At that point, defendant Meyers performed a "palm revival technique" or "kidney slap" used to bring plaintiff back to consciousness and then placed plaintiff in a Level 1 minus hold in order to keep plaintiff under control as he regained

consciousness. Defendant Meyers testified he was trained to place subjects in a light hold as they regained consciousness because they could often wake up aggressive. Defendant Meyers claimed he kept plaintiff in the second hold for less than 10 seconds and that plaintiff did not lose consciousness a second time as a result of the second hold. It is uncontested that at some point between the first and second hold, plaintiff was handcuffed and his legs were ziptied. Defendant Hedges testified he helped secure plaintiff's legs because plaintiff was still acting aggressively.

Plaintiff asserts that defendants used excessive force after he was removed from the bed by defendant Burlie. He claims that he was repeatedly struck, kicked, and punched by defendants on two separate occasions. He testified that after being thrown face-down on the floor by defendant Burlie, he felt multiple people jump on top of him and that he was struck multiple times on the back of his head, shoulders, and back as he was placed in the first hold. Plaintiff then testified that as he was regaining consciousness from the first hold, he felt multiple strikes to his back, head, and arms, likely from more than one person. He claimed he felt more than 10 strikes to his body and as he tried to shield himself, he realized he was handcuffed and ziptied. Plaintiff cried out for help and then felt someone place him in a second hold, which also rendered him unconscious. Plaintiff claims he suffered numerous bruises and scrapes.

When piecing together uncontested facts, the entire allegation of excessive force lasted approximately 40 seconds. This time period began when defendant Pickering placed plaintiff in the first hold and lasted until defendant Meyers released plaintiff from the second hold. During this time plaintiff was also handcuffed and ziptied. Plaintiff does not allege excessive force was used by defendant Burlie when he tackled him off the bed, nor does he allege excessive force was used when he was handcuffed and ziptied.

Plaintiff was eventually removed from the room and placed in a police car.  Dispatch records indicate that the entire incident—from the time of entry into the hotel room until the scene was clear—was less than ten minutes.  Plaintiff remembers "coming to" standing in front of a police car.  He asked to be taken to the hospital for neck pain.  Police transported plaintiff to the hospital, and, according to police reports, plaintiff was x-rayed and doctors determined "nothing was broken or twisted."  (Doc. 166-13, at 5.)  Plaintiff does not remember being treated at the hospital.  Plaintiff was then taken to the Hutchinson Police Department.

Plaintiff was tried in Reno County District Court on 19 charges related to the March 22, 2011 incident.  The court has taken judicial notice of the county records.  A jury found plaintiff guilty of one count of kidnapping his sister, one count of aggravated assault of his sister, one count of aggravated endangerment of a child, five counts of aggravated assault on a law enforcement officer, one count of criminal possession of a firearm, two drug charges, and one count of solicitation to commit perjury.  Notably, the jury found him not guilty on charges of kidnapping his daughter, and not guilty of aggravated assault on defendant Burlie for "using Burlie's handgun" to assault him.  This charge was related to defendant Burlie's belief that plaintiff grabbed for his gun as he tackled him off the bed.  Plaintiff's convictions were affirmed by the Kansas Court of Appeals, and the Kansas Supreme Court denied plaintiff's petition for review.  *See Kansas v. McCoy*, No. 110,827, 2015 WL 3632037 (Kan. Ct. App. June 5, 2015).

## II.     Legal Standards

### a. Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine" factual dispute requires more than a mere scintilla of evidence.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the initial burden of showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party demonstrates an absence of evidence in support of an element of the case, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248.  The nonmoving party "may not rest upon the mere allegations or denials of his pleading."  *Id.*

In making the summary judgment determination, the court must view the evidence and reasonable inferences in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 252.

### b. Qualified Immunity

Qualified immunity recognizes "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).  It protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When a defendant has moved for summary judgment based on qualified immunity, the court must "view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor."  *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).   A defendant is entitled to qualified immunity unless the plaintiff can show "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct."  *Id.*  The Supreme Court has held a court has the

discretion to consider "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If, however, a plaintiff successfully overcomes the two-part analysis, the burden shifts to the defendant "as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Booker*, 745 F.3d at 412.

### III.    Analysis

Defendants moved for summary judgment on the basis that they are entitled to qualified immunity, arguing the force used during the arrest was not excessive, and even it if it was, it was not clearly established at the time that their conduct violated plaintiff's rights.  Plaintiff argues there are issues of material fact as to the level of force used, which precludes summary judgment at this stage. Plaintiff further claims that viewing the evidence in the light most favorable to him, defendants are not entitled to qualified immunity because their force was excessive.

As mentioned above, in order to overcome defendants' assertion of qualified immunity, plaintiffs must show "that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have not thought the force constitutionally permissible (violates clearly established law)." *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007).

In overturning its rigid mandate that this two-step inquiry must always be decided in order, the Supreme Court now allows flexibility for courts to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances." *Callahan*, 555 U.S. at 236. In light of the fact-intensive circumstances of this case, the court will first address whether a constitutional violation exists.

### a.  Constitutional Violation

-8-

In deciding whether defendants' conduct was impermissible in violation of plaintiff's constitutional rights, the court must first determine the relevant facts. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Because the case is at the summary judgment stage, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Id.* In qualified immunity cases, this often means adopting the plaintiff's version of facts, so long as that version is not "so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380. The question then becomes whether the facts, as described by plaintiff, support a claim that plaintiff's constitutional rights were violated.

In *Graham v. Connor*, 490 U.S. 386 (1990), the Supreme Court held that when an excessive force claim arises in the context of an arrest, the constitutional right at issue "is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures of the person.'" *Id.* at 394. The Fourth Amendment is violated when force is "excessive under objective standards of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223. Objective reasonableness turns on the "facts and circumstances of each particular case," and a court must make such a determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. *See also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2476 (2015) ("For these reasons, we have stressed that a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer."). Further, a court must engage in a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396.

The arrest of an individual suspected of breaking the law carries special considerations.  The Supreme Court has reasoned that "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.  When judging reasonableness under the Fourth Amendment, courts must also recognize that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or the threat thereof to effect it."  *Id.* at 396.  Therefore, when evaluating a claim of excessive force, courts must keep in mind that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment."  *Id.*  This also applies when an officer makes a reasonable judgment call—mistaken or not—as to the level of threat a suspect poses.  *See Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (noting "even if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed.")

The Supreme Court has set out a list of factors to consider when evaluating reasonableness in an excessive force claim: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  The factors should be considered paying "careful attention to the facts and circumstances of each particular case."  *Id.*  Thus, a judgment as to whether an officer's conduct during an arrest constitutes excessive force requires a fact-intensive review of the specific circumstances of each case, considering the perspectives of the officers at the scene.

Here, the court must first determine, viewing the evidence in the light most favorable to plaintiff, what relevant facts must be considered.  Plaintiff's evidentiary record is thin at best, his only

source of evidence coming from his own deposition testimony and a brief affidavit he composed.  Yet

his account of the facts is not so inconsistent with the rest of the record that it all must be disregarded.

Plaintiff claims that the first time he realized police were at the hotel was when they first entered his

hotel room.  He denies ever pointing a gun at the police or at his sister, but admits that he dropped his

gun before defendant Burlie tackled him off the bed.  The court, however, cannot accept as true

plaintiff's account that he did not point his gun at the officers as they entered the room.  Plaintiff was

convicted of five counts of aggravated assault on a law enforcement officer based on his pointing a gun

at defendants as they entered the room.  To reach a decision in this case taking plaintiff's account of

the facts as true would be contrary to *Heck v. Humphrey*, 512 U.S. 477, 487 (1994) ("when a state

prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor

of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the

complaint must be dismissed . . . .").  The court, instead, must review the circumstances accepting as

true that plaintiff threatened defendants with a gun as they entered the hotel room.

    After defendant Burlie tackled him off the bed and onto the ground, plaintiff claims he tried to

submit to arrest but was placed into a chokehold while officers immediately started striking him on the

back.  He claims he was choked into unconsciousness and stopped breathing.  As noted above, the

court cannot accept plaintiff's account that he stopped breathing as true because there is no evidentiary

support in the record besides plaintiff's own contention.  Plaintiff based this contention not on his own

recollection, but on one fleeting statement from defendant Burlie's police report that was later revised

under oath.

    Plaintiff then claims as he regained consciousness, he felt officers striking him, and felt "more

than ten" strikes to his head, back, and shoulders.  He claims that he tried to shield himself from the

blows but realized he was handcuffed and his legs were ziptied.  Plaintiff then alleges he was again

choked into unconsciousness and regained consciousness standing in front of a police car.  He claims he had bruises, cuts, and scrapes as a result of the incident.

Most of plaintiff's account of the events aligns with defendants' side of the story.  Plaintiff acknowledges he dropped his gun after defendants entered the hotel room.  He admits defendant Burlie tackled him off of the bed onto the floor.  He also admits he was twice placed in a hold.   Both parties concede plaintiff was rendered unconscious after defendant Pickering placed him in a hold and both parties admit plaintiff was handcuffed and ziptied and placed in a second hold.  Defendants concede defendant Meyers struck plaintiff on the back when attempting a "kidney slap" to help him regain consciousness.  And plaintiff also acknowledges he was struck in the back by defendants.

Plaintiff, however, claims that in the 40 seconds where defendants were attempting to de-escalate the situation and restrain him, he was unnecessarily placed in a hold.  And in those 40 seconds, in between coming in and out of consciousness, he felt defendants striking him in the back more than 10 times. But again, according to the Supreme Court, the defendants' actions must be viewed from the perspective of a reasonable officer at the scene, considering that "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 397.

When considering the three factors from *Graham*, the court does not find defendants' actions were unreasonable. Here, defendants reasonably believed they were faced with a high-risk, potentially violent situation.  They had been called in as a special Emergency Response Team to handle a hostage situation involving an armed individual.  When they entered the room, plaintiff pointed a gun at them, causing many of the defendants fear for their lives.  They knew there were two individuals in the room

who were also at risk.  In a fraction of time, defendants had the responsibility to remove the hostages from danger, disarm plaintiff, and place him under arrest.

As plaintiff dropped the gun, defendant Burlie tackled him to the floor and felt him reaching for his gun.  Although plaintiff denies reaching for the gun, the court, again, must evaluate the situation considering the reasonable perspectives of the officers.  Even if plaintiff did not reach for the gun, defendant Burlie had a reasonable belief he did.  He then yelled for assistance and defendant Pickering placed plaintiff in a hold in order to prevent him from procuring the gun.  Over the next 40 seconds, defendants were able to de-escalate the situation and place plaintiff under arrest.  Any strikes plaintiff may have felt were part of defendants attempt to subdue a subject who, just minutes or even seconds before, had been threatening officers and his hostage with a gun.  Plaintiff claims that any force against him after he was handcuffed and ziptied was unnecessary, because he had already been restrained and no longer posed a threat.  Yet it is much easier now, with the benefit of hindsight, to break down the rapidly evolving incident and attempt to pinpoint exactly when plaintiff was restrained and the force should have ended.  And again, as the Supreme Court has cautioned, the court must consider the circumstances based on "what the officer knew at the time, not with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Because defendants acted reasonably in a high-risk, rapidly evolving situation, the court finds defendants did not violate plaintiff's Fourth Amendment rights, and qualified immunity is appropriate.

### b.  Clearly Established Law

Regardless of whether defendants violated plaintiff's Fourth Amendment rights, they are still entitled to qualified immunity because plaintiff is also unable to overcome the second prong of the two-part test—that the law was clearly established at the time of the violation, putting defendants on notice that their conduct was unconstitutional.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Therefore, summary judgment based on qualified immunity is appropriate when the law "did not put the officer on notice that his conduct would be clearly unlawful." *Id.* (also noting that denying summary judgment "any time a material issue of fact remains on the excessive force claim— could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'").

Determining when a law is clearly established ordinarily requires "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as plaintiff maintains." *Booker*, 745 F.3d at 427. Because a Fourth Amendment reasonableness determination requires a fact intensive inquiry of the circumstances of each individual case, it is often difficult to find established law involving an identical fact pattern. The Tenth Circuit, therefore, has adopted a sliding scale approach to determine when law is clearly established. *Id.* Under the sliding scale approach, "the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to establish the violation." *Id.* Put in another way, if the facts indicate an egregious amount of force, more general case law forbidding excessive force is sufficient to put an officer on notice that his conduct is unconstitutional. *See, e.g.*, *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (noting that in a case where officers held children at gunpoint after gaining control of a situation, officers were not entitled to qualified immunity because "there were no substantial grounds for a reasonable officer to conclude that there was legitimate justification for his conduct."). In *Casey*, the Tenth Circuit used the facts of

*Graham* as an example of a particularly egregious force situation, stating "when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law." *Id.* Thus, we may use *Graham* as a guidepost to determine with what specificity the law must be established to overcome qualified immunity in this case.

In *Graham*, a diabetic man asked a friend to drive him to a convenience store so he could purchase orange juice to counteract an insulin reaction. 490 U.S. at 388. When the diabetic man arrived at the convenience store, he saw a number of people in line to check out, and, concerned about the delay, quickly left to find somewhere else to get juice. *Id.* at 388–89. An officer saw the man quickly enter and leave the convenience store and grew suspicious, so he followed the car and pulled the two men over. *Id.* at 389. When the diabetic man told the officer he was suffering from a reaction, the officer called for backup so he could investigate what had happened at the convenience store. *Id.* Meanwhile, the diabetic man had exited the car and briefly passed out on the curb. *Id.* Officers cuffed the man's hand behind his back, ignoring his pleas for sugar. *Id.* Officers then picked him up and slammed him face down on the hood of the police car. *Id.* A friend brought orange juice to the scene, but officers refused to give it to the man. *Id.* The man was eventually released when officers received word there was no incident at the convenience store, but the man suffered a broken foot, bruises, cuts, and a shoulder injury as a result of the confrontation with police. *Id.* at 389–90.

Because this court cannot say that the facts of the present case establish a sufficiently clear violation of the Fourth Amendment compared to the factual scenario in *Graham*, we must look for case law that would more specifically put defendants on notice their conduct was unlawful. When looking for case law that would put defendants on notice of the illegality of their conduct, "the salient question . . . is whether the state of the law [at the time of the conduct] gave respondents fair warning that their

alleged treatment of [plaintiff] was unconstitutional." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) (citing *Hope v. Pelzer*, 536 U.S. 730,744 (2002)).

To meet his burden of demonstrating the law was clearly established, plaintiff argues Tenth Circuit case law prohibits the use of continued, gratuitous force after a subject has already been subdued. He points to various cases involving the use of force after a subject has been restrained. Yet the cases plaintiff cites can be distinguished from the present facts to the extent that there is no case law that would have put defendants on notice their conduct was unconstitutional. For example, plaintiff cites cases in which the restrained subject never presented a serious risk of threat to police that would justify the level of force used. *See Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991); *Herrera v. Bernalillo Cnty. Bd. Of Cnty. Com'rs*, 361 F. App'x 924 (10th Cir. 2010) (unpublished); *Gouskos v. Griffith*, 122 F. App'x. 965 (10th Cir. 2005) (unpublished). Plaintiff also cites cases in which the excessive force was against a person already in custody. *See Bafford v. Nelson*, 241 F. Supp. 2d 1192, 1205 (D. Kan. 2002). Prisoner excessive force cases, however, are analyzed under the Eighth Amendment, rather than the Fourth Amendment. *See Graham*, 490 U.S. at 398 (noting, "[d]iffering standards under the Fourth Amendment and Eighth Amendment are hardly surprising: the terms 'cruel' and 'punishments' clearly suggest some inquiry into subjective state of mind, whereas the term 'unreasonable' does not.").

Further, there is no clearly established law that would put defendants on notice that the specific hold maneuver was unreasonable. While the Tenth Circuit has found a chokehold may give rise to a finding of excessive force, it has not found that a chokehold, per se, is unconstitutional. *See Booker*, 745 F.3d at 425 (finding that a chokehold used for approximately two and a half minutes on a pretrial detainee who was accused of swinging his arm toward a deputy could be excessive when the deputy

was trained to only use the chokehold for one minute, the inmate was already face-down on the ground, and the move contributed to the inmate's death.).

In the present case, defendants reacted to a high-risk situation as it unfolded, moving quickly to get hostages to safety and disarm, subdue and arrest plaintiff.  Plaintiff claims that he felt defendants striking him even after he was restrained.  He argues case law clearly establishes that any force used after a subject is restrained is unreasonable. Again, as noted above, it easy to pinpoint exactly when, if any, force was used after plaintiff was restrained with the benefit of hindsight after the fact.  Because any force occurred during the 40 second period in which defendants were attempting to arrest plaintiff, the court cannot find that case law is clearly established to the extent that defendants would be aware their conduct was unreasonable.

The court would also briefly mention that plaintiff moved to exclude defendants' expert witness testimony.  Defendants' expert witness is trained in the LVNR technique and was prepared to testify as to the reasonableness of defendants' use of the LVNR in this situation.  This evidence was not necessary in the court's determination that defendants are entitled to qualified immunity, and thus, the motion will be denied as moot.

**IT IS THEREFORE ORDERED** that defendants Meyers, Pickering, and Burlie's Motion for Summary Judgment (Doc. 163) and defendants Hedges and Graber's Motion for Summary Judgment (Doc. 164) are granted.

**IT IS FURTHER ORDERED** that plaintiff's Motion to Exclude Expert Testimony of Charles Huth (Doc. 161) is denied as moot.

This case is closed.

Dated March 16, 2017, at Kansas City, Kansas.


s/ Carlos Murguia

**CARLOS MURGUIA**
**United States District Judge**